Filed 5/6/21  P. v. Saavedra CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>DAVID SAAVEDRA,<br><br>　　Defendant and Appellant. | H046938<br>(Santa Cruz County<br>Super. Ct. No. 16CR05794)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The court orders that the opinion filed April 16, 2021, be modified as follows:

On page 5, first full paragraph, second to last sentence, insert "rectal," after "vaginal," and before "and breast swabs."

On page 41, delete the first two full paragraphs, which state:

"Defendant contends that the prosecution committed misconduct when it erroneously argued to the jury (1) that an instruction would allow it to consider uncharged acts evidence 'for corroboration,' and (2) defendant's uncharged acts against S.S. were 'consistent with the fact that [Doe 1] had injuries consistent with her anus being penetrated.' "

"Defendant first argues that the prosecution's use of the word 'corroboration' misstated how uncharged acts evidence could be used by the jury.  However, defendant omits that soon after making this comment, the prosecution told the jury that if it determines the uncharged acts evidence had been proven by a preponderance of the evidence, it could 'use [the acts] for a particular purpose,' such as proof of identity or intent.  The trial court's instructions also stated that if the jury determines defendant committed the uncharged acts, it could consider the evidence for the limited purpose of deciding whether defendant was the person who committed the charged offenses, whether defendant acted with the requisite intent, and whether defendant knew that Doe 1 was incapable of consenting.  Thus, " ' "[i]n the context of the whole argument and the instructions," ' " we determine there was no " ' "reasonable likelihood the jury understood or applied the complained-of comment[] in an improper or erroneous manner. [Citations.]" '  (*Centeno*, *supra*, 60 Cal.4th at p. 667.)"

The petition for rehearing filed on behalf of defendant David Saavedra is denied.

There is no change in the judgment.

_____
BAMATTRE-MANOUKIAN, J.


_____
ELIA, ACTING P.J.


_____
DANNER, J.


2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID SAAVEDRA,<br><br>    Defendant and Appellant. | H046938<br>(Santa Cruz County<br>Super. Ct. No. 16CR05794) |

## I.    INTRODUCTION

Defendant David Saavedra appeals after a jury convicted him of committing sex offenses against two victims almost a decade apart.  For his conduct against Doe 1 in 2001, when defendant was 24 years old, the jury convicted defendant of rape of a developmentally disabled person (Pen. Code, § 261, subd. (a)(1))[1] and forcible rape (§ 261, subd. (a)(2)).  For his conduct against Doe 2 in 2009 and 2010, when defendant was approximately 33 years old, the jury convicted defendant of three counts of committing a lewd act on a child under age 14 (§ 288, subd. (a)) and found true the allegation that he committed the offenses during a burglary (§ 667.61, subds. (a), (b), (d)(4)).  The jury also found that defendant committed qualifying sex offenses against multiple victims (§ 667.61, subds. (b), (e)(4)).  The trial court sentenced defendant to 90 years to life.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant contends that insufficient evidence supports his conviction of forcible rape; the trial court misinstructed the jury on the elements of rape of a developmentally disabled person; the court erroneously denied his request for a *Mayberry*[2] instruction on the offenses against Doe 1; his trial counsel rendered ineffective assistance by failing to object to evidence and argument on two civil judgments and by failing to object to multiple instances of prosecutorial misconduct; and he suffered cumulative prejudice from the trial court errors and counsel's ineffective assistance.

For reasons that we will explain, we will affirm the judgment.[3]

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prosecution Case*

#### 1.  Crimes Against Doe 1[4]

Deprived of oxygen for 20 minutes at birth, Doe 1 was severely developmentally disabled.  When Doe 1 was around 11 years old, her mother placed her in a care facility in Felton.

At age 20 in 2001, Doe 1 was unable to toilet herself, dress herself, engage in general self-care, or converse.  If asked how she was doing, Doe 1 would respond nonsensically, sometimes with made-up words.  Doe 1 generally communicated like a two-year-old and developmentally was "toddler age," two or under.  She had no sense of danger, self-awareness, or understanding of sex.  Because of her inability to communicate when she needed to go to the bathroom, Doe 1 wore a diaper that someone dressed her with.  She could pull up slip-on pants if directed and the pants were already placed in the right

---

[2]  *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*).
[3]  Defendant's appellate counsel has filed a petition for writ of habeas corpus that this court ordered considered with the appeal.  We have disposed of the habeas petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)
[4]  After a brief Evidence Code section 402 hearing, the trial court found Doe 1 was not competent to testify.  The trial court subsequently told the jury, "I've had an evidentiary hearing concerning [Doe 1], and I'm finding that she is not legally competent to testify."

direction, but she could not remove her diaper. She had to be guided into bed at night. Doe 1 was "mostly happy all the time," although she sometimes would be grumpy, upset, or agitated. She was always boisterous and laughed a lot, including when she was nervous.

Doe 1 was the care facility's "highest risk client" because she did not have any "safety awareness." During outings, someone always had to hold Doe 1's hand. Otherwise, "[s]he would run out into the street" and "bolt from the group." She could not follow verbal instructions or nonverbal prompts.

Doe 1 often interacted with strangers during outings. For example, if someone walked by, Doe 1 would sometimes say, "[H]ey buddy, how you doing?" If the person asked Doe 1 how she was doing in response, Doe 1 would be unable to engage in "give and take." If asked, she could not tell a person her name. Doe 1 did not behave sexually or provocatively. She never expressed any interest in sex.

During an outing in Watsonville on May 4, 2001, Doe 1 "bolted" from one of her caregivers and was missing for approximately three hours and 45 minutes. Video surveillance footage from an ATM showed the care facility's van pull up at 7:37 p.m. and a caregiver get out and use the ATM. The footage showed that when the caregiver returned to the van at 7:38 p.m., he looked concerned and began to search the area around the vehicle.

Around 7:40 p.m., 16-year-old J.M. noticed Doe 1 in a driveway in the back of a mobile home trying to pet an aggressive, growling dog. Doe 1 was "trying to reach [the dog] and laughing. . . . It was odd." Doe 1 "was not acting normally," although J.M. presumed she had "[a] normal sense of the situation . . . like a normal regular person." Doe 1 seemed to be older than him, but not an adult. Doe 1's hands were in loosely closed fists as she tried to pet the dog. Doe 1 did not appear to be injured and all her clothing was on. Doe 1 did not seem to realize the danger of trying to pet the dog.

J.M. told Doe 1 that the dog was not friendly and tried to get her away from it. Doe 1 giggled in response. J.M. pulled her away from the dog and asked Doe 1 her name and where she lived, but Doe 1 was unable to clearly respond. Doe 1 pointed and giggled, but

J.M. could not understand her mumbling. Doe 1 appeared lost and "unable to get to where . . . she belonged."

J.M. tried to get Doe 1 to "a safer place" and walked out to the street with Doe 1 following him. When they got to an intersection, Doe 1 was unable to direct J.M. which way to go. They continued walking, but it was difficult to keep Doe 1 on the sidewalk. Doe 1 giggled and laughed. J.M. decided to walk towards the downtown area to find the police station, but they got lost. By that point it was completely dark out. Once in the downtown area, J.M. got frustrated because it was more and more difficult to keep Doe 1 with him. He had walked with her for 30 minutes to an hour. He told Doe 1 he could not help her anymore and left. Unbeknownst to J.M., they were a block from the police department.

At approximately 11:15 p.m., David Souza was driving on Route 129 in Watsonville, when he noticed "[a] young lady crossing the road." The way the woman was crossing the street "was not normal." Souza would have hit her if he had not stopped. The woman's head was "kind of weaving," she seemed lost and childlike, and it looked like "something really bad happened." No one else was around and it was a dangerous area. Souza called 911.

Doe 1 was located by the Watsonville Police around 11:15 p.m. She was found in a residential neighborhood at an intersection near the athletic fields of the Watsonville High School. The intersection was not well lit and the athletic fields were completely dark. Doe 1 had dirt on her clothes and abrasions on her neck, back, and arms as if she had been lying on her back. Her hair was mussed. The police tried to ask Doe 1 what had happened, but she was "unable to communicate." Although she was "smiling and seemed happy," she "kind of cowered." She had no social skills. Her disability was evident to the police.

When Doe 1's mother arrived at the Watsonville Police Department after they found Doe 1, Doe 1 was "crazed," "really dishelved," and "really, really, really agitated." Doe 1's mother "could tell she was . . . really, really upset and anxious and super alert . . . like she

4

was terrified." One of Doe 1's caregivers noticed that Doe 1 was not wearing her diaper and "her underwear was balled up and shoved inside her pants." "[I]t was clear that somebody had taken off her diaper and her underwear and then shoved the underwear back inside her pants" because Doe 1 was incapable of doing those things herself. Doe's underwear was soiled with dirt and blood and her pants had bloodstains in the crotch.

Doe 1 was given a Sexual Assault Response Team (SART) exam around 12:00 a.m. Doe 1 was unable to communicate what had happened to her. She had a bruise by her mouth; petechiae on her right breast; an abrasion with dirt on her right inner wrist; linear abrasions and redness on her back; multiple abrasions towards the bottom of her vagina; a hematoma on her hymen caused by blunt force trauma and penetration; abrasions at her posterior fourchette; an abrasion close to her anus; and fissures around her anus. The hematoma on her hymen, abrasions at her posterior fourchette, and fissures and abrasion around her anus were blunt force or penetration injuries. Doe 1 had dirt in the folds of her buttocks and stool coming out of her rectum. Doe 1 was menstruating. According to Doe 1's mother, Doe 1's right nipple "looked like somebody had chewed on it really hard, and it was nearly bleeding." The SART nurse collected oral, vaginal, and breast swabs from Doe 1. Once she returned to her care facility, Doe 1 was very subdued and quiet, which was unusual for her.

DNA profiles were subsequently developed from Doe 1's vaginal swabs. The criminalist detected a major and a minor contributor of sperm cells on the swabs. J.M. was excluded as a sperm-cell contributor.

Later in the summer of 2001, Doe 1 and her mother were eating lunch outside in Santa Cruz. A car pulled up beside them and two Hispanic men got out. Doe 1 "freaked out and took off running." Doe 1's mother had never seen her respond to men like that before and thought, "[O]h my God, she remembers."

Defendant's estranged wife testified that at some point in 2001, during a conversation about sex partners, defendant told her about "a sexual act . . . committed [on the loading

docks at] his work with a woman who he had to take a diaper off of to commit the act with." Defendant was working the night shift at Alfaro's Bakery across the street from the Watsonville High School stadium. Defendant stated that the woman "seemed a little off, but still normal," but he also said that "she was not acting like a normal human." He described her as "slow" and "tried to explain that the diaper was there because she was on her period." Defendant stated that he did not use a condom. Defendant's wife did not believe the story.

In August 2016, Watsonville Police Detective Elizabeth Sousa was notified that there had been a DNA hit in the state database in the case involving Doe 1. Detective Sousa obtained a DNA reference sample from defendant. The DNA profile developed from defendant's reference sample matched the DNA profile developed from the sperm cells of the major sperm-cell contributor on Doe 1's vaginal swab.

Additional DNA analysis was performed in 2018. Defendant could not be excluded as a contributor to the DNA mixture present on Doe 1's left breast swab. Testing of a vaginal swab revealed a DNA mixture consistent with three people, a major male contributor and two minor contributors, one of whom was Doe 1. The major male contributor's DNA profile matched defendant's DNA profile. The unknown contributor's profile was consistent with the male DNA profile developed from Doe 1's right breast swab. A DNA expert opined that the results were consistent with two men, one of whom was defendant, having sex with Doe.

### 2. Crimes Against Doe 2

In 2010, when Jane Doe 2 was eight or nine years old and living at her mother B.C.'s house in Watsonville, a man would enter Doe 2's room at night and use the flashlight on his phone to see if she was awake. When Doe 2 would open her eyes and look in the man's direction, the man would hide behind the door to her room and turn off the light. Doe 2 did not know who the man was, but this would happen on the same nights Doe 2 would hear a man's voice coming from B.C.'s room.

6

Doe 2 would go back to sleep, but "movement in [her] bed" would awaken her. Doe 2 would be on her side and the same man who had been in her doorway would be behind her pulling down her underwear. The man would place his hands on Doe 2's buttocks and "play[] with" Doe 2's anus. Doe 2 could not see what the man used to touch her anus, but it felt like "[s]omething skinny." She was not sure whether the man ever penetrated her anus. It felt "horrible," and one time Doe 2 told the man to stop, but he continued. Doe 2 was too scared to yell out for her mom or move. She felt "frozen." When the man finished touching her, he would "zip up his pants and just leave." Doe 2's buttocks would feel "[s]limy."

The touching happened "a lot," more than three times. Doe 2 started to put pants on over her underwear "to make it harder" for the man to touch her, but that did not work. Doe 2 would also try to stay awake so that the man would not touch her, but eventually she would fall asleep and "[h]e would come and do it again."

B.C had been having an affair with defendant, which she kept secret from Doe 2. Defendant lived five or six houses down the street from B.C. and would come over at night when his wife was at work and Doe 2 had already gone to bed. Defendant and B.C. would talk and have sex in B.C.'s room. After they had sex, defendant would use the restroom, which was past Doe 2's room. During this time period, no other men came over to B.C.'s house except for her brother. During their affair, B.C. had two children with defendant, a son and a daughter.

At some point, Doe 2 told B.C. about the touching, but B.C. did not believe her.[5] B.C told Doe 2 that "it was just a dream."

After telling B.C., Doe 2 told her third-grade teacher hoping that she would "[m]ake it stop." Doe 2 told her teacher that one of her mother's friends had come into her room at

---

[5] B.C. testified that she learned of Doe 2's molestation allegations from the police, not Doe 2.

night and touched her "bottom," and it scared her. Doe 2 said that she asked the man to stop but he did not.

A Child Protective Services (CPS) social worker arrived at the school to talk to Doe 2. Doe 2 told the social worker that at night, a male friend of her mother's pretends to leave the house, comes into her room, touches her butt, and pulls her pants down. Doe 2 stated that she tells the man to stop but he will not stop. Doe 2 said that she told her mother but her mother did not believe her. Doe 2 stated that the touching occurs almost every time the man comes over to her house.

The social worker called the police. An officer responded to the school and interviewed Doe 2 alone in the principal's office.[6] Doe 2 told the officer that a man pulls down her pants and touches her buttocks, sometimes spreading her buttocks apart. Doe 2 would feel something "wet and slimy" on her buttocks area, but she did not know what it was. She thought the man might be licking her. The man did not touch any other part of Doe 2's body. Doe 2 said that it happened a lot. She once told the man to stop but he continued. When asked if she had told anyone before she told her teacher, Doe 2 stated that she told her mother but her mother did not believe her.

When B.C. came to pick up Doe 2 after school, she was not allowed to take her home. B.C. did not remember Doe 2 telling her what had been happening. B.C. told the officer that she did not believe Doe 2's complaint because defendant was always with B.C. when he was at the house. Doe 2 was placed in foster care and had supervised visits with B.C.

A sexual assault detective interviewed Doe 2.[7] Doe 2 used stuffed animals to show that when the man came into her room, she would be lying on her side and the man would lie behind her. The detective showed Doe 2 a photograph of defendant, and Doe 2 identified defendant as the man who touched her.

---

[6] The interview was partially recorded and the recording was admitted into evidence.
[7] The interview was video recorded and the recording was admitted into evidence.

8

Another CPS social worker interviewed Doe 2 as part of her investigation into whether Doe 2 could be reunified with her mother. Doe 2 told the social worker that her mother's friend would come into her room at night and touch her buttocks. Doe 2 expressed that her mother did not believe her and that she was concerned about her siblings' safety. The social worker did not press Doe 2 for additional details because Doe 2 had already been interviewed multiple times, including by the police.

B.C. continued her affair with defendant and allowed him to see their two children. The children were removed from B.C.'s custody in February 2011 because she was still involved with defendant. According to B.C., during the court process defendant told her that he was concerned about getting a paternity or DNA test "because they were going to try to blame something on him."

When Doe 2 was going through the photographs on B.C.'s phone one day, she saw a photo of the man who had touched her. She later learned the man was her brother's and sister's father.

The detective and a social worker attempted to contact defendant, but he did not return their calls. The detective went to defendant's residence and asked defendant if he would be willing to be interviewed about Doe 2's molestation allegations. Defendant agreed to meet the detective at the police department in "15 minutes," but defendant did not show up. The detective returned to defendant's residence twice that day but could no longer locate defendant.

### 3. Other Evidence

Defendant's estranged wife testified that the day before their wedding in early 2001, defendant lost his temper and threw a remote control at her. Defendant continued to be violent with her during their marriage, sometimes daily, sometimes every couple months. Defendant was sexually violent with her "about as frequent[ly]."

According to defendant's wife, defendant "was obsessed with the anus." Defendant often had his thumb in or on her anus during intercourse or attempted to have anal sex with

9

her. Defendant's wife would try to tell him no or pull away, but "[h]e would continue anyways," penetrating her digitally or with his penis. Sometimes she would cry or be tense, but that would not stop him. Defendant perpetrated many sex acts against her will. Sometimes he would hold her down and rape her even when she repeatedly said no. Other times he would initiate sex with her while she was asleep and their daughter was in their bed.

In June 2007, defendant admitted following a customer around Ben Lomond Market and taking photographs under her dress with his cell phone. Defendant stated that he thought the customer was flirting with him, which the customer denied. Defendant acknowledged that he did not have permission to take the photographs. The store's video surveillance captured defendant kneeling close to the customer with something in his hand, which was underneath the woman's dress. The customer had just been at a nearby pool and was not wearing anything under her dress because her bathing suit was wet. Video footage on defendant's phone depicted a "flash[] up under a skirt" and a woman's genitalia. Defendant stipulated that he was subsequently convicted of attempting to secretly photograph or electronically record another person under or through her clothing without her consent or knowledge for sexual gratification.

While this case was pending, defendant's attorneys asked defendant's wife to testify on defendant's behalf. When defendant's wife declined, defendant wrote her "[v]eiled threats and orders." Two of defendant's letters contained death threats.

**B.** *Defense Case*

The defense rested without presenting evidence.

**C.** *Charges, Verdicts, and Sentence*

Defendant was charged by information with rape of a developmentally disabled person (§ 261, subd. (a)(1); count 1), forcible rape (§ 261, subd. (a)(2); count 2), three counts of lewd act on a child under age 14 (§ 288, subd. (a); counts 3-5), and sexual intercourse or sodomy with a child age 10 or younger (§ 288.7; count 6). The information

10

also alleged that defendant committed counts 3 through 5 during a burglary (§ 667.61, subds. (a), (b), (d)(4)), engaged in substantial sexual conduct with a victim who was under age 14 (§ 1203.066, subd. (a)(8)), and committed qualifying sex offenses against multiple victims (§ 667.61, subds. (b), (e)(4)).

Before the start of jury selection, the trial court dismissed count 6 and the substantial sexual conduct allegation at the prosecution's request.

A jury found defendant guilty of the remaining charges and found the remaining allegations true.

The trial court sentenced defendant to 90 years to life by imposing four consecutive life terms: 15 years to life on count 2 and 25 years to life on counts 3 through 5. The court imposed and stayed an eight-year term on count 1.

## III. DISCUSSION

### A. *Sufficiency of the Evidence in Support of Forcible Rape Conviction (Count 2)*

Defendant contends there is insufficient evidence to uphold his conviction of forcible rape of Doe 1 because the prosecution failed to prove he personally used force or aided and abetted another person's use of force. The Attorney General counters that the jury could reasonably infer defendant used force against Doe 1 based on her injuries and defendant's statement to his wife that he engaged in "a sexual act . . . with a woman he had to take a diaper off of to commit the act with."

"Forcible rape is defined as 'an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [¶] . . . [¶] . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' (§ 261, subd. (a)(2).)" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022 (*Griffin*).) "The term 'force' as used in the rape statute is not specifically defined" and has "no specialized legal meaning." (*Id.* at pp. 1022-1023.) " 'Because the fundamental wrong is the violation of a woman's will and sexuality, the law of rape does not require that "force" cause physical harm. Rather, in this scenario, "force"

11

plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will.' " (*Id.* at p. 1025.) "In the context of rape, 'against the victim's will' is synonymous with 'without the victim's consent.' " (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460 (*Giardino*).)

"In considering defendant's claim of insufficiency of the evidence of force necessary to affirm his conviction of forcible rape, we must determine only whether, on the record as a whole, any rational trier of fact could find him guilty beyond a reasonable doubt. [Citation.] We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Griffin*, *supra*, 33 Cal.4th at p. 1028.)

In *Griffin*, the California Supreme Court considered whether the force necessary to sustain a conviction of forcible rape must have been " '*substantially* different from or *substantially* greater than' the physical force normally inherent in an act of consensual sexual intercourse." (*Griffin*, *supra*, 33 Cal.4th at p. 1023.) The court rejected such a quantum of proof. "To the contrary, it has long been recognized that 'in order to establish force within the meaning of section 261, [former] subdivision (2), the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the [victim's] will.' " (*Id.* at pp. 1023-1024.) " ' " '*The kind of physical force is immaterial.*' " ' " (*Id.* at p. 1024.) Thus, "even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Id.* at p. 1027.)

The case before us involves a highly unique set of circumstances. Severely developmentally disabled, 20-year-old Doe 1 was at the developmental stage of a two-year-old and unable to converse at the time of the offense. As a result, she could not disclose what happened to her when she was missing from her caregivers for several hours and was not competent to testify at trial.

12

The evidence established that when Doe 1 was found by the police, she was disheveled and dirty. Her balled up underwear was stuffed into her pants and her diaper was gone. Doe 1 underwent a SART exam, which revealed vaginal and anal injuries, a bruise by her mouth, and an abrasion to her inner right wrist. The SART nurse characterized Doe 1's vaginal and anal injuries as blunt force or penetration injuries.

The same year of the offense, defendant told his wife that he engaged in "a sexual act . . . with a woman who he had to take a diaper off of to commit the act with."

Subsequent DNA analysis revealed that defendant's DNA profile matched the DNA profile developed from the sperm cells on Doe 1's vaginal swab. However, there was also a second man's DNA present on Doe 1's vaginal swab, which was consistent with the male DNA found on Doe 1's right breast. A DNA expert opined that the results were consistent with two men having sex with Doe 1, one of whom was defendant.

We agree with defendant that given that the DNA results indicated that two men had sex with Doe 1, it cannot reasonably be inferred that it was defendant who inflicted Doe 1's injuries. There was also no evidence that defendant aided and abetted the other individual, such that Doe 1's injuries could legally be attributed to him.

However, we determine that other record evidence sufficiently supports the forcible rape conviction. The evidence established that Doe 1 had no interest in or understanding of sex. Doe 1's doctor testified that Doe 1 was "someone at the two-year-old level" and that was "being generous." It was also established that Doe 1 could not dress or toilet herself, was unable to remove her own diaper, and had to be guided into bed at night. One of Doe 1's caregivers testified that Doe 1 was unable to follow verbal instructions or nonverbal prompts.

The director of Doe 1's care home testified regarding dressing and caring for Doe 1, "You had to start the shirt -- you know, like you do with a toddler – start the shirt over her head and put her arm through one arm hole, that kind of thing." "You had to bathe her. You would . . . walk her into the tub and bathe her. You had to wash her hair. You had to

change her diaper." "[F]or tooth brushing, you could put the toothbrush in her hand and bring it to her mouth, and she might do a few brush strokes, but then her hand would sort of fade. Mostly you had to do it with her hand over hand. . . . [S]he required hand over hand assistance." Similarly, the SART nurse testified that Doe 1 needed help undressing and had to be "[d]irect[ed] on whatever we needed her to do." Verbal cues were not sufficient. Doe 1 had to be helped onto the exam table and needed assistance putting her legs in the stirrups.

Based on this record, we determine there is substantial circumstantial evidence from which the jury could reasonably infer that defendant used force against Doe 1. The jury could reasonably infer from defendant's statement to his wife that he engaged in "a sexual act" with a woman whose diaper he had to take off and the DNA match that defendant removed Doe 1's diaper to have sex with her. Further, it was reasonable to infer that defendant positioned Doe 1's body to accomplish intercourse with her based on the evidence that Doe 1 had no sexual awareness and had to be physically guided to accomplish basic tasks. (Cf. *People v. Iniguez* (1994) 7 Cal.4th 847, 857 [" 'Fear' may be inferred from the circumstances despite even superficially contrary testimony of the victim"].)

In *People v. Young* (1987) 190 Cal.App.3d 248, 258 (*Young*), which was cited with approval in *Griffin*, *supra*, 33 Cal.4th at page 1024, the Court of Appeal held there was sufficient evidence of force where the defendant "sat [a six-year-old child] on top of him, pulled her pants down and put his finger in her 'private place.' " The defendant then "made her 'scoot down' " and "put his 'private place' in her 'private place.' " (*Ibid.*) The court concluded that "some force was used by [the] defendant in both the penetration and the physical movement and positioning of [the child's] body in accomplishing the act." (*Ibid.*)

Similar to the defendant's removal of the child's clothing in *Young*, there was substantial evidence here that defendant removed Doe 1's diaper to accomplish sexual intercourse with her. (See *Young*, *supra*, 190 Cal.App.3d at p. 258.) Moreover, for the reasons stated, there was substantial circumstantial evidence that defendant would have had

14

to position Doe 1 to have sex with her. While evidence of force is required to prove forcible rape, the amount of force necessary is solely that which demonstrates " '[the] act of intercourse has been undertaken against a victim's will.' " (*Griffin*, *supra*, 33 Cal.4th at p. 1025.) As stated above, " 'against the victim's will' is synonymous with 'without the victim's consent' " (*Giardino*, *supra*, 82 Cal.App.4th at p. 460), and defendant does not challenge the evidentiary support for the jury's finding that Doe 1 did not consent to intercourse with him. Given that there is no question regarding Doe 1's nonconsent, " ' " '[t]he kind of physical force [used] is immaterial,' " ' " and "conduct which might normally attend sexual intercourse . . . can support a forcible rape conviction" (*Griffin*, *supra*, 33 Cal.4th at pp. 1024, 1027, italics omitted), we conclude there is sufficient evidence that defendant used force to accomplish intercourse with Doe 1 against her will.

For these reasons, we reject defendant's insufficiency of the evidence claim.

**B.** *Misinstruction on Rape of a Disabled Person*

Defendant claims the trial court made two errors when instructing on the offense of rape of a disabled person. First, defendant contends the court erroneously instructed the jury that the crime only required evidence of general intent, omitting the required proof of criminal negligence. Second, defendant contends the court failed to define criminal negligence for the jury. Defendant asserts that the errors violated his due process rights. The Attorney General counters that the court fully instructed the jury on the offense with CALCRIM Nos. 252 and 1004.

**1. Trial Court Proceedings**

When instructing the jury with CALCRIM No. 252 on whether the charged crimes required general or specific intent, the trial court stated that rape of a disabled person required proof of "general criminal intent." The court explained, "For you to find a person guilty of the[] crime[] . . . , that person must not only commit the prohibited act; but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally

15

does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation."

The trial court instructed the jury on rape of a disabled person with CALCRIM No. 1004. The court stated that the prosecution had to prove: "1. The defendant had sexual intercourse with a woman"; "2. He and the woman were not married to each other at the time of the intercourse"; "3. The woman had a developmental or physical disability that prevented her from legally consenting"; and "4. The defendant knew or reasonably should have known that the woman had a developmental or physical disability that prevented her from legally consenting."

### 2. Standard of Review

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) We consider the instructions as a whole and in the context of the entire charge (*People v. Haskett* (1990) 52 Cal.3d 210, 235), and " ' " ' "we . . . assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 95).

### 3. Analysis

" 'When a definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.' [Citation.] General criminal intent thus requires no further mental state beyond

16

willing commission of the act proscribed by law." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*).)

Rape is "an act of intercourse undertaken without . . . consent." (*Griffin*, *supra*, 33 Cal.4th at p. 1025.) "Some of the various means of committing rape specified in the subdivisions of section 261 deal with the lack of the victim's actual consent while others deal with the victim's lack of capacity, i.e., with the lack of legal consent." (*Giardino*, *supra*, 82 Cal.App.4th at p. 460.) Rape of a disabled person occurs when "an act of sexual intercourse [is] accomplished with a . . . [non]spouse . . . : [¶] . . . [w]here a person is incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act." (§ 261, subd. (a)(1).)

"[R]ape is a general intent crime." (*People v. Molano* (2019) 7 Cal.5th 620, 667.) Performing any of the acts proscribed under section 261 "[i]s enough to violate the law." (*People v. Osband* (1996) 13 Cal.4th 622, 685-686 (*Osband*); see also *People v. Linwood* (2003) 105 Cal.App.4th 59, 70 (*Linwood*) ["Rape is a general intent crime [citations], and requires only the perpetrator's criminal intent to commit sexual intercourse without the partner's consent"].)

Here, the trial court's instruction with CALCRIM No. 252 that rape of a disabled person is a general intent crime was proper because the offense occurs "without reference to intent to do a further act or achieve a future consequence." (*Sargent*, *supra*, 19 Cal.4th at p. 1215.) The offense consists solely of engaging in sexual intercourse with a nonspouse who is "incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act." (§ 261, subd. (a)(1).)

Defendant argues that "[t]he jury should have been instructed that the general intent definition it received only applied to the act of intercourse, and that the State was required to also prove the wrongful intent of criminal negligence as to whether the defendant knew or

17

should have known of the victim's disability."  However, section 261, subdivision (a)(1)'s requirement that the perpetrator must have known or reasonably should have known that the victim was incapable of giving legal consent because of his or her disability is not an intent requirement but a knowledge requirement.  (See *Linwood*, *supra*, 105 Cal.App.4th at p. 71; cf. *People v. Dancy* (2002) 102 Cal.App.4th 21, 37 [stating that rape of an unconscious person has "two separate mens rea requirements" in that "[a] defendant may be convicted . . . only if he had both *knowledge* of the person's unconsciousness and the *wrongful intent* to engage in an act of sexual intercourse with an unconscious person" (italics added)].)  Thus, the trial court was not remiss in instructing that rape of a disabled person is a general intent crime.

Nor did the trial court omit the criminal negligence element of rape of a disabled person or fail to define the criminal negligence standard as defendant contends.  The court correctly instructed the jury using CALCRIM No. 1004 that the prosecution had to prove "defendant knew or reasonably should have known that the woman had a developmental or physical disability that prevented her from legally consenting."  The instruction's "reasonably should have known" language tracked both the rape statute and the criminal negligence standard, which is " 'an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' "  (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*); see also *id.* at pp. 789-790 ["Criminal negligence . . . is a standard for determining when an act may be punished under the penal law because it is such a departure from what would be the conduct of an ordinarily prudent or careful person under the same circumstances."]; *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 ["there can be no criminal negligence without actual or constructive knowledge of the risk"].)

Quoting *Valdez*, *supra*, 27 Cal.4th at pages 783 and 788, which involved a conviction of child endangerment, defendant argues that the trial court erred because it did not instruct the jury that " '[o]rdinary negligence will not suffice' and that 'criminal negligence involves

18

a higher degree of negligence than is required to establish negligent default on a mere civil issue.' [Citation.] 'The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences.' " To the extent defendant asserts that the trial court's instruction needed amplification or clarification regarding the criminal negligence standard, he has forfeited the claim for failure to raise it below. (See *People v. Moon* (2005) 37 Cal.4th 1, 29 (*Moon*).) Moreover, as observed in *Linwood*, "[t]he jury was instructed that [defendant] was required to commit an intentional act . . . ; in other words, mere negligence would not suffice." (*Linwood*, *supra*, 105 Cal.App.4th at p. 71.)

"There being no error, we also reject defendant's claim that the alleged instructional error[s] violated his due process rights under the United States Constitution." (*Moon*, *supra*, 37 Cal.4th at p. 30.)

### C. *Denial of a Mayberry Instruction*

Defendant contends that his due process rights and right to present a defense were violated when the trial court refused to instruct the jury on the counts involving Doe 1 that a defendant's reasonable and good faith mistake of fact regarding a person's consent to intercourse is a defense to rape. (See *Mayberry*, *supra*, 15 Cal.3d at p. 155.) The Attorney General counters that the court properly declined to give a *Mayberry* instruction because there was no evidence to support it.

#### 1. Trial Court Proceedings

Defendant requested a *Mayberry* instruction during in limine motions. The trial court deferred ruling on the request because "it depends on what the evidence shows." Defendant concurred.

19

During a subsequent conference on jury instructions, the trial court found that the evidence was "not . . . sufficient to allow the submission of the *Mayberry* instruction. In fact, the evidence, from the Court's perspective, appears nonexistent." (Italics added.)

### 2. Analysis

In *Mayberry*, the California Supreme Court held that a reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. (*Mayberry*, *supra*, 15 Cal.3d at p. 155.) "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361, fn. omitted (*Williams*).)

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "[I]n determining whether the *Mayberry* instruction should be given, the trial court must examine whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*Williams*, *supra*, 4 Cal.4th at p. 361.)

Defendant contends that a *Mayberry* instruction was warranted here based on the prosecution's evidence that Doe 1 was "an 'attractive' young adult woman, of 'normal'

appearance, who was used to being undressed by others, and who was known to habitually laugh and smile, even when that affect was inappropriate," thereby satisfying the objective component of the *Mayberry* defense. Defendant further asserts that his estranged wife's testimony that defendant told her he had a "sexual encounter" with a woman who seemed "slow" and "a little off, but still normal," and who wore a diaper because she was menstruating, established the subjective component of the *Mayberry* defense. Defendant also raises J.M.'s testimony that when he encountered Doe 1 after she had gone missing, he "thought that she had . . . [a] normal sense of the situation, you know, like a normal regular person."

Defendant relies on this court's decision in *People v. Andrews* (2015) 234 Cal.App.4th 590, 599 (*Andrews*), which involved a conviction of misdemeanor sexual battery. There, the defendant testified that the victim engaged in " 'playful' " conduct with him and "then wrapped her legs around his waist and pulled him on top of her." (*Id.* at p. 603.) Thinking that the victim wanted to have sex, the defendant unbuckled her belt and unsnapped her pants. (*Ibid.*) The victim put her hand over her zipper which the defendant interpreted as a cue to stop, but "then pulled her shirt up over her bra." (*Ibid.*) The defendant touched the victim's breast over her bra, and stated at trial that he did not think he was doing anything unwanted. (*Id.* at pp. 603-604.) This court held that a *Mayberry* instruction should have been given because there was "substantial evidence of equivocal conduct by [the victim] leading to [the] defendant's touching of her breast" and "the same evidence was sufficient for a trier of fact to have concluded that [the] defendant's subjective but mistaken belief that [the victim] had consented to the touching of her breast was objectively reasonable under the circumstances." (*Id.* at p. 604.)

We conclude that rather than supporting defendant's claim, *Andrews* illustrates what is lacking in the record here. Regarding the objective requirement of the *Mayberry* defense, defendant argues there was circumstantial evidence of Doe 1's equivocation based on testimony that Doe 1 was of " 'normal' appearance," would laugh even when nervous, and

21

was used to being undressed by others. But such evidence—normal appearance, laughing when nervous, and being routinely undressed by others—is not circumstantial evidence of a reasonable belief of Doe 1's *consent to sexual intercourse*, given that consent is defined as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) The evidence defendant cites is appreciably different from that in *Andrews*, where the defendant testified that the victim wrapped her legs around him, pulled him on top of her, and lifted her shirt up exposing her bra. (*Andrews*, *supra*, 234 Cal.App.4th at p. 603.) "[A] trial court must give a requested instruction only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " (*Williams*, *supra*, 4 Cal.4th at p. 361.)

Nor do we find the testimony of defendant's wife that defendant recollected a "sexual encounter" he had with a woman who was "slow" and "a little off, but still normal," substantial evidence that defendant subjectively believed Doe 1 consented to sexual intercourse. This testimony was evidence that defendant may have believed Doe 1 was not developmentally disabled; it was not evidence that defendant believed Doe 1 consented to have sex with him. Moreover, defendant omits his estranged wife's contradictory testimony that defendant told her Doe 1 "was *not* acting like a normal human." (Italics added.)

Based on the lack of substantial evidence that "defendant honestly and reasonably, but mistakenly, believed that [Doe 1] consented to sexual intercourse" (*Williams*, *supra*, 4 Cal.4th at p. 361), we conclude that the trial court properly refused defendant's request for a *Mayberry* instruction. Therefore, the court's denial of the instruction did not violate

defendant's due process rights or right to present a defense.[8]  (See *Moon*, *supra*, 37 Cal.4th at p. 29.)

### 3.  Even Assuming the Instruction Was Warranted, Defendant Was Not Prejudiced

Lastly, we observe that even if the trial court erred when it failed to give a *Mayberry* instruction, defendant was not prejudiced under *Chapman* or *Watson*[9] because the jury found beyond a reasonable doubt when it convicted defendant of rape of a disabled person that defendant knew or reasonably should have known Doe 1 had a developmental disability that prevented her from legally consenting.  The jury's verdict necessarily means that the jury would not have found that defendant's mistaken belief that Doe 1 consented to intercourse was reasonable under the circumstances, as required to satisfy *Mayberry*'s objective component.  (See *Williams*, *supra*, 4 Cal.4th at p. 361.)  Thus, defendant was not prejudiced by the trial court's refusal to give a *Mayberry* instruction.

### D.  *Counsel's Failure to Object to Evidence and Arguments on Civil Judgments*

Defendant contends that his counsel rendered constitutionally ineffective assistance by failing to object to evidence and arguments on Doe 1's conservatorship, the removal of Doe 2 from her mother's custody, and the termination of the mother's parental rights over Doe 2 because civil judgments are inadmissible in criminal cases.  The Attorney General

---

[8]  The Attorney General contends that *Mayberry* does not apply to count 1, rape of a developmentally disabled person, because "[c]onsent is *not* a defense to the charge." Because we determine that there is not substantial evidence to support a *Mayberry* instruction, we do not address the Attorney General's claim.

[9]  The California Supreme Court has not resolved whether the failure to give a *Mayberry* instruction when required constitutes federal constitutional error, where prejudice is analyzed under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), or state law error, where prejudice is assessed under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  (See *Andrews*, *supra*, 234 Cal.App.4th at p. 605.)  Under *Chapman*, reversal is mandated unless the instructional error was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, at p. 24.) Under *Watson*, reversal is warranted if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, at p. 836.)

counters that there was no ineffective assistance of counsel because the evidence was relevant and admissible.

### 1. Trial Court Proceedings[10]

#### a. *Evidence and argument involving Doe 1*

Doe 1's mother testified that she was granted conservatorship powers over Doe 1 in March 2001 because Doe 1 could not care for herself. The mother stated that as Doe 1's conservator, she has the right to decide Doe 1's medical care, where Doe 1 lives, and Doe 1's consent to marriage and sex. Later in the mother's testimony, the mother was asked to identify conservatorship records filed with the court and quoted the court records when describing her powers over Doe 1, including "to overrule the conservatee's right to control . . . her own social and sexual contacts and relationships." The mother also testified that she believed she gave consent for Doe 1's SART exam; she consented to the prosecution filming Doe 1 for a court exhibit showing Doe 1's communication abilities; and she "[a]bsolutely [did] not" consent to defendant having sex with Doe 1.

One of Doe 1's doctors testified that a partner in his medical practice "conserved" Doe 1 in 2001. A probate court investigator testified that she interviewed Doe 1 in February 2001. She found that Doe 1 would be able to attend a conservatorship hearing but "it would have no meaning for her." The investigator stated that she "recommended that the conservatorship in its totality be approved."

The conservatorship records were admitted into evidence without objection. Included in the records was a capacity declaration, where Doe 1's doctor gave his evaluation of Doe 1's mental function and ability to consent to medical treatment. Also included was a court order appointing a limited probate conservator, finding that Doe 1 was unable to

---

[10] Although defendant summarizes the prosecution's assertions during opening statement regarding the conservatorship and parental rights evidence, he makes no claim of ineffective assistance with respect to those statements. Thus, we do not summarize the prosecution's opening statement here.

provide for her personal needs for physical health, food, clothing, or shelter; was substantially unable to manage her finances; and did not have the capacity to consent to medical treatment. The order also listed the limited conservator's powers.

The prosecution referenced the conservatorship in closing arguments. When discussing count 1, rape of a developmentally disabled person, the prosecution raised among other evidence regarding Doe 1's inability to legally consent to sexual intercourse that Doe 1's mother had Doe 1 conserved two months before the incident "because she knows . . . that [Doe 1 is] never going to be able to make decisions about medical treatment, about marriage, about sex." The prosecution also stated, "[Doe 1] . . . legally couldn't consent because of the conservatorship."

Regarding count 2, forcible rape, the prosecution argued regarding the element of consent, "Doe 1 is incapable of consenting. She does not understand the nature of the act. She's legally incapable of consenting because [of] the conservatorship," and, "We know she could not consent; therefore, she did not consent."[11]

### b. *Evidence and argument involving Doe 2*

Regarding the offenses against Doe 2, the prosecution introduced testimony from several witnesses, including Doe 2's mother, that Doe 2 was removed from her mother's custody and placed in foster care. Doe 2's mother also testified that her parental rights over

---

[11] Defendant claims that the prosecution also relied on the conservatorship evidence to argue regarding count 2 "that it was relieved of [the] need to prove 'force' because [Doe 1] had no will to overcome as a 'legal' matter." However, we find no reference to the conservatorship during the prosecution's argument on the element of force. Rather, the prosecution argued that there is sufficient force "if a person uses enough physical force to overcome the [victim's] will"; that "[w]hen you have a severely intellectually disabled woman who is basically . . . a toddler in a woman's body, there's virtually no will to overcome"; and that "if there's no consent and a man puts his penis in a woman's vagina, that alone is sufficient force because the woman's will has been overcome." The prosecution later stated based on Doe 1's developmental disability that the force necessary to overcome Doe 1's will was "the will essentially of a toddler."

Doe 2 and her younger children were terminated. Social workers testified regarding the investigation and removal process when child sex abuse claims are made.

In addition, a social worker testified that Doe 2 was placed in foster care because of child molest allegations. On cross-examination, the social worker testified that at the point that she is assigned to work with families, "the investigating social worker has determined the allegations to be substantiated, and from the standpoint where dependency court has already determined that the allegations . . . fell under [the] Welfare and Institutions Code." The social worker stated on redirect that allegations have been substantiated when they have been found true by the dependency court and by the investigating social worker. When the prosecution asked what the allegations were and whether the allegations were "that Doe 2 was molested by David Saavedra," the trial court sustained defendant's objections. The social worker later stated that Doe 2's younger siblings were also removed from the mother's custody "based on those same allegations."

During a jury recess, the trial court stated that the social worker's testimony "regarding the findings by CPS and/or the dependency court" was admitted "to some degree, without objection, but further questioning by [the prosecution] as to the process of substantiating the allegations was objected to, and those objections were sustained. From the Court's perspective, the findings of CPS and dependency are -- basically, the jury will determine whether the allegations are accurate or not. From the Court's perspective, going any further into that process was not appropriate."

Another social worker subsequently testified that there was a dependency petition "in this case [that] has allegations regarding sexual abuse"; a judge had decided "that the children remain out of the home" and reunification services be provided; and a judge would have told the mother "how long she had to reunify with her kids" and "the consequences if she did not demonstrate an ability to keep her kids safe." The social worker stated that the mother was advised to get a restraining order against defendant but never did. The social

26

worker testified that she was present at the disposition hearing and that Doe 2 and her siblings were not allowed to return to the mother's custody.

The prosecution argued to the jury when discussing Doe 2's credibility that Doe 2 maintained her allegations of abuse despite being placed in foster care "which she was not pleased with." Later, when discussing the mother's credibility, the prosecution argued that while the mother maintained that the molestation could not have happened, she lied to CPS by stating that she was no longer involved with defendant. The prosecution continued, "And during this time period, . . . Doe 2 never goes back with her mother because her mother . . . is, in fact, still seeing the Defendant and CPS deems him a risk to her. So she never goes back to her mother. And as a result of [the mother's] attitude and choices, Child Protective Services takes her two youngest children from her, and she knows why. CPS believes that . . . Defendant poses a risk to those children, and so they're removed. And through this process, [the mother] is with . . . Defendant trying to lie to CPS to kind of . . . keep him out of trouble." The prosecution added, "[The mother] chose . . . Defendant over her own children. And as a result of that, both her and the Defendant's parental rights were terminated." When later discussing Doe 2's credibility versus the mother's credibility, the prosecution characterized Doe 2 as the person who has consistently been describing the abuse for eight years. The prosecution characterized the mother as "the mom who lied to the family court, lied to CPS and was willing to lose custody of all of her children to stay with a man who was basically using her for sex and was in a married relationship[.]"

### 2. Analysis

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) Regarding prejudice, a "defendant must

show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) Prejudice requires a showing of "a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland*, *supra*, at p. 697.)

### a. *Ineffective assistance claim regarding counsel's failure to object to evidence and argument on Doe 1's conservatorship*

We determine that defendant has not shown that he was prejudiced by the admission of evidence on Doe 1's conservatorship or by the prosecution's arguments that the conservatorship proved Doe 1 was incapable of giving consent. (*Strickland*, *supra*, 466 U.S. at p. 694.) Even when the evidence of Doe 1's conservatorship is not considered, there is overwhelming record evidence that Doe 1 was incapable of giving consent because of her severe developmental disability. Thus, the admission of the conservatorship evidence and the prosecution's arguments on it do not "undermine [our] confidence in the outcome" on counts 1 and 2. (*Ibid.*)

As stated earlier, in rape prosecutions, consent means "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and *have knowledge of the nature of the act* or transaction involved." (§ 261.6, italics added.) The jury was instructed on count 1 with CALCRIM No. 1004 that "a woman is prevented from legally consenting if she is unable to understand the act, its nature, and possible consequences." (Italics omitted.) On count 2, the jury was instructed with CALCRIM No. 1000 that "[t]o consent, a woman must act freely and voluntarily and know the nature of the act." (Italics omitted.)

Multiple witnesses testified that Doe 1 had the capacity of a two-year-old and had no awareness or understanding of sex. The evidence was unrefuted that Doe 1 was unable to dress or toilet herself, care for her hygiene, converse, or appreciate danger. Rather than challenge this evidence and assert that the prosecution had failed to prove Doe 1 was incapable of giving legal consent (count 1) and Doe 1 did not consent (count 2) to sexual intercourse, defendant argued that the prosecution had not established that he knew or reasonably should have known Doe 1 had a developmental disability that prevented her from legally consenting (count 1) and that the prosecution had not proved force (count 2).

Based on the strength of the evidence regarding Doe 1's severe developmental disability and its impact on her ability to "have knowledge of the nature of the act," and, thus, consent to intercourse (§ 261.6), coupled with the defense strategy not to contest lack of consent, there is no "reasonable probability" that the trial outcome would have been different had defendant's counsel objected to the conservatorship evidence and it not been admitted (See *Strickland*, *supra*, 466 U.S. at p. 694). Thus, defendant's claim of ineffective assistance of counsel pertaining to the conservatorship evidence and arguments fails. (See *ibid.*)

> **b.** ***Ineffective assistance claim regarding counsel's failure to object to evidence and argument on the removal of Doe 2 from her mother's custody and termination of parental rights***

We determine that defendant has not shown that counsel's failure to object to evidence that Doe 2 had been removed from her mother's custody and that parental rights had been terminated, or the prosecution's arguments regarding that evidence, "fell below an objective standard of reasonableness" under prevailing professional norms. (*Strickland*, *supra*, 466 U.S. at p. 688.) Further, we determine that defendant has not a shown "a reasonable probability that, but for counsel's [nonobjection to the evidence], the result of the proceeding would have been different." (*Id.* at p. 694.)

29

" '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Lopez* (2008) 42 Cal.4th 960, 972 (*Lopez*).) "Because after a conviction it is all too easy to criticize defense counsel and claim ineffective assistance, a court must eliminate the distorting effects of hindsight by indulging 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citations.]' [Citation.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 158, superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63 & fn. 8.)

Here, regarding the counts involving Doe 2, which, as defense counsel argued, was "a single witness case," counsel's reasonable strategy was to demonstrate that Doe 2 could not be believed. In pursuing that strategy, counsel relied on the mother's testimony that she initially thought Doe 2's allegations of abuse were "impossible" because defendant was always with her and had never met Doe 2, as well as the mother's testimony that Doe 2 frequently made up stories, wanted attention, and was jealous of not having a father. Counsel urged the jury to believe the mother's initial rejection of Doe 2's allegations by stressing that "despite what everyone wanted her to say, despite what would get her her children back, which . . . would get her out of deep trouble with CPS," the mother thought and expressed that "this is not possible that this happened." Counsel argued that the mother maintained her rejection of Doe 2's allegations "for many years" despite that "all she needed to do to get . . . Doe 2[] returned to her would have been to reject [defendant] and to believe these charges."

It was reasonable for counsel not to object to the CPS and parental rights evidence because the evidence demonstrated the strength of the mother's longstanding conviction regarding the falsity of Doe 2's claims and, thus, undermined Doe 2's credibility. Similarly, it was also reasonable for counsel not to object to the prosecution's statements during argument reflecting that the mother's children had been removed from her custody and

30

parental rights had been terminated. Some of the prosecution's argument even dovetailed with the defense, such as when the prosecution asserted that the mother "was willing to lose custody of all of her children . . . ."

In addition, defendant's ineffective assistance of counsel claim fails because he has not demonstrated a "reasonable probability," such that our confidence in the trial results is undermined, that the trial outcome would have been different had counsel objected to the CPS and parental rights evidence and the evidence not been admitted. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

Importantly, the prosecution did not rely on the CPS and parental rights evidence as proof of the crimes' elements. Rather, the prosecution used the evidence to demonstrate Doe 2's credibility, arguing that Doe 2 did not recant her allegations despite her negative reaction to being placed in foster care, and to attack the credibility of Doe 2's mother. The prosecution highlighted that during the same period the mother disbelieved Doe 2, the mother was lying to CPS and the court. The prosecution did not argue that the CPS and parental rights evidence demonstrated defendant's guilt or that the jury should believe Doe 2 because CPS and the dependency court believed her.

Moreover, despite that the charges involving Doe 2 were single-witness crimes, the strength of the evidence against defendant was strong. Doe 2 testified that when she was eight or nine years old, defendant would come into her room at night, place his hands on her buttocks, and "play[] with" her anus. The evidence included Doe 2's consistent disclosures to multiple people—her teacher, CPS social workers, and the police—that corroborated Doe 2's trial testimony. Those disclosures included Doe 2's statements when she was eight or nine years old that she would feel something "slimy" on her buttocks area after the touching occurred but did not know what it was. She thought that the person could have been licking her. The police interviews were recorded and played for the jury. In addition, the prosecution presented evidence of defendant's consciousness of guilt, commission of other sex offenses, including the crimes against Doe 1, who was a severely developmentally

31

disabled woman whom an onlooker described as "childlike," and defendant's "obsess[ion] with the anus."

For these reasons, we find there was a reasonable basis for defense counsel not to object to the CPS and parental rights evidence and also determine there is no reasonable probability of a different trial outcome had the evidence not been admitted. Accordingly, we reject defendant's ineffective assistance of counsel claim. (*See Strickland*, *supra*, 466 U.S. at p. 687.)

### E. *Ineffective Assistance of Counsel for Failure to Object to Prosecutorial Misconduct*

Defendant contends his trial counsel was ineffective because she failed to object to several instances of alleged prosecutorial misconduct, some of which occurred during argument to the jury.[12]

The general rules applying to claims of prosecutorial misconduct are as follows: "A prosecutor's conduct violates the federal Constitution only when it is ' " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726 (*Ledesma*).) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was

---

[12] Defendant's ineffective assistance claims based on counsel's failure to object to alleged prosecutorial misconduct include counsel's nonobjection to the prosecution's arguments regarding Doe 1's conservatorship and the removal of Doe 2 from her mother's custody and the termination of parental rights. Because we addressed those claims above, we do not restate them here.

'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*Lopez*, *supra*, 42 Cal.4th at p. 966.) "Keeping in mind that '[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel' [citation], we examine each instance of alleged misconduct." (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

### 1. Prosecution's Argument that DNA Evidence Proved Doe 1 Was "Gang-Raped"

Defendant contends that his trial counsel was ineffective for failing to object to the prosecution's comment during argument that "the DNA suggests, and I would submit to you, proves that . . . Defendant and another man gang raped . . . Doe 1, two on one." Defendant asserts that the argument was scientifically unsound because DNA evidence does not establish the timing of events and that the prosecution "sought to evoke racial animus" through its use of the term " 'gang rape[].' " (Capitalization and bold omitted.)

As we stated above, when assessing whether the prosecution's argument constituted misconduct, we consider the prosecution's statements in context. (See *Centeno*, *supra*, 60 Cal.4th at p. 667.) Here, immediately before the prosecution made the complained-of comment, the prosecution asserted, while discussing the DNA evidence, "And so given how long . . . Doe 1 was missing, this . . . short time frame we have, what this [DNA evidence] suggests is that . . . Defendant raped . . . Doe 1 with another man."

Although we agree that DNA evidence alone does not establish the timing or sequence of events, given the context in which the prosecution's statement was made, where

33

the prosecution specifically referenced the short of amount of time Doe 1 was missing from her caregivers, we do not find there is " 'a reasonable likelihood the jury understood or applied the complained-of comment[] in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) Rather, the jury would have understood the prosecution to be arguing that given the short timeframe *and* the DNA results demonstrating two men had sex with Doe 1, there was circumstantial proof that Doe 1 had been raped by two men in concert. Thus, the prosecution's argument was not improper as " '[t]he prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine.' " (*People v. Thomas* (1992) 2 Cal.4th 489, 526 (*Thomas*).)

Further, we observe that defense counsel appropriately responded to the prosecution's argument by asserting that beyond the DNA evidence, "we don't know anything else about the circumstances." Counsel further argued, "We have the presence of semen, but we do not know the circumstances of how this act occurred or any of the interactions that took place in this event. This is an unknown."

Regarding the prosecution's use of the term "gang rape[]," defendant argues that the prosecution "chose to use the word 'gang' knowing that [defendant] is a Hispanic man," during a time "when racial prejudice against Hispanics . . . was running particularly high," and despite that "this was not a gang case." But we find nothing in the record to suggest that the prosecution used the term to provoke racial bias against defendant. This matter involved rape charges where the evidence established that defendant and another man had sex with Doe 1 at some point while she was missing from her caregivers for just under four hours. In this context, there is no reasonable likelihood that the jury understood the term "gang rape" differently from its dictionary definition, which is "[t]he rape of one person (usually a woman) by several men in succession." (Oxford English Dict. Online

34

<https://www.oed.com/view/Entry/377465?rskey=NMrCxi&result=2#eid> (as of Apr. 16, 2021), archived at <http://perma.cc/N79P-JA9S.); see also, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 504, 566 [using the term as shorthand for rape in concert]; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1249 [same], superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "To the extent of any ambiguity in the prosecutor's statements, we do not lightly infer that [s]he intended them to have their most damaging meaning, or that the jury would draw that meaning from the other, less damaging interpretations available." (*Thomas*, *supra*, 2 Cal.4th at p. 530.)

For these reasons, because the prosecutor's comment did not constitute misconduct, "[i]t follows that defense counsel was not ineffective in making no objection." (*Thomas*, *supra*, 2 Cal.4th at p. 531.)

### 2. Prosecution's Alleged Misconduct Involving Uncharged Acts Evidence

The prosecution moved in limine under Evidence Code sections 1108 (section 1108) and 1101, subdivision (b) (section 1101, subdivision (b)) to present evidence of defendant's uncharged acts of spousal rape and nonconsensual anal penetration.

Defendant contends that the prosecution misrepresented its case to the trial court during the hearing on its in limine motion; the prosecution violated the parameters of the trial court's order on the uncharged acts evidence; the prosecution submitted erroneous jury instructions on the uncharged acts evidence; and the prosecution misused the uncharged acts evidence in argument. Defendant claims that his trial counsel's failure to object to each instance of alleged prosecutorial misconduct constituted ineffective assistance of counsel.

### a. *Misrepresentations during motions in limine*

Defendant contends that his counsel was constitutionally ineffective for failing to object to the prosecution's assertion during the in limine hearing on its uncharged acts motion that Doe 2 would testify defendant anally penetrated her. Defendant argues that "the prosecution knew or should have known" this was a mischaracterization of its evidence

"because it had dismissed the only charged count of sodomy in the [Doe 2] case one week earlier." Defendant further contends that his counsel was ineffective for failing to object to the prosecution's statement that Doe 1's SART exam revealed findings "consistent with anal penetration" because "the prosecution knew or shown have known" the SART evidence did not demonstrate defendant anally penetrated Doe 1. Lastly, defendant contends that his counsel should have argued that section 1108 does not allow evidence of uncharged acts to prove another uncharged act when the prosecution "told the court it wanted evidence of uncharged sodomy to support its uncharged theory that [Doe 1] had been anally penetrated."

While the prosecution did on the eve of trial move to dismiss a section 288.7, subdivision (a) charge against defendant alleging that he engaged in "sexual intercourse and sodomy" with Doe 2 when she was 10 years old or younger, no reasons were stated for the dismissal and defendant does not point to other support for his contention that "the prosecution knew or should have known" Doe 2 would not testify to anal penetration. The prosecution stated in its written motion that when Doe 2 was reinterviewed by the police at age 17, she recalled that "defendant would put his penis in her butt when he would come into her room at night." At the hearing, the prosecution asserted that "anal play or anal penetration is precisely what [Doe 2] describes. She describes her buttocks being pried apart and wetness in her butt. Later on as she's older she's described something penetrating . . . her anus from behind . . . ." On this record, crediting defendant's contention that the prosecution "knew or should have known" Doe 2 would not testify to anal penetration would require us to speculate, which we may not do. (See *Osband*, *supra*, 13 Cal.4th at p. 695 [rejecting speculative prosecutorial misconduct claim].) As defendant has not established that the prosecution committed misconduct when it told the court that Doe 2 recollected that defendant penetrated her anus when she was younger, defendant has failed to demonstrate that his counsel's nonobjection to the proffer was remiss. (See *Thomas*, *supra*, 2 Cal.4th at p. 531.)

36

Nor has defendant established that the prosecution mischaracterized its evidence when it stated during the hearing on its uncharged acts motion that Doe 1's SART exam was "consistent with anal penetration." The SART nurse testified at trial that she observed an abrasion close to Doe 1's anus and fissures around her anus. When later asked by the prosecution whether there was "some kind of penetrating trauma" to Doe 1's "rectum," the nurse responded, "Yes." Based on this testimony, the prosecution's assertion that the SART findings were "consistent with anal penetration" was not a misstatement, and defense counsel was not ineffective for failing to object it. (See *Thomas*, *supra*, 2 Cal.4th at p. 531.)

Lastly, defendant has not demonstrated that he was prejudiced by his counsel's failure to argue during the in limine hearing that section 1108 does not allow evidence of uncharged acts to prove another uncharged act. The prosecution did assert that its proposed evidence of defendant's uncharged acts of nonconsensual anal intercourse with his wife was relevant because the SART findings were "consistent with [the] anal penetration [of Doe 1]," despite that defendant was not charged with anally penetrating Doe 1. However, this evidence *was* relevant to the charges against defendant for his lewd conduct against Doe 2 (counts 3-5), as the prosecution also argued. Thus, we find there is no "reasonable probability" that the trial court would have excluded this uncharged acts evidence, and that the trial outcome would have been different as a result, had defense counsel argued that section 1108 does not authorize the admission of uncharged sex offenses to prove another uncharged sex offense. (See *Strickland*, *supra*, 422 U.S. at p. 694.)

### b. *Violations of order on uncharged acts evidence*

Defendant contends that his counsel was ineffective for failing to object to the prosecution's alleged violation of the trial court's order excluding certain uncharged acts evidence.

At the hearing on the prosecution's in limine motion to present uncharged acts evidence under sections 1108 and 1101, subdivision (b), the trial court gave its tentative

rulings on the proposed evidence before it heard substantive arguments from the parties. As relevant here, the court stated that it intended to exclude testimony by defendant's wife, S.S., that "sex with . . . defendant was forceful and that she felt she could not say no" because it was vague and not particularly probative. The court later added, "The fact that [defendant] would be forceful in sex or that [S.S.] could not say no would not be admissible. The fact that he held her down to [engage in sex acts] I think is relevant."

After hearing from the parties, the court ruled that the prosecution would be allowed to present testimony "as to [defendant] holding [S.S.'s] arms down when certain aspects of sex [were] taking place." The court further authorized the prosecution to present evidence that defendant "would have sex with [S.S.] when she pretended to be asleep, that there was some level of domestic violence, that he would engage in sexual conduct when she was on her stomach pretending to be asleep, [and] that he would hold her down and continue to proceed with sex." The court commented that this evidence was admissible "from an 1101 perspective" as it "relate[d] to the issues presented in this case and the circumstances described by the two complaining witnesses . . . and from the Court's perspective keeping in mind 1108 that [sic] would be sufficient." The court later stated that it had "reviewed all of this information pursuant to . . . [s]ection 1108" and "performed a[n] [Evidence Code section] 352 analysis . . . . [¶] As to those items that I've excluded I found that either the prejudicial impact significantly overrides the probative value and/or it's going to be confusing to the jury and/or it will be too time consuming. So I'll stand on those decisions."

Defendant contends that the prosecution violated the trial court's order when it engaged in the following exchange with S.S. during trial. The prosecution asked S.S. whether there were "any sexual encounters [with defendant] that were against [her] will and forceful." S.S. responded, "Yes, many." The prosecution asked S.S. to describe generally "what that . . . entail[ed]," and S.S. responded that there was an incident shortly after she gave birth where defendant was trying "to force [her] to have vaginal intercourse." The prosecution asked S.S. what she meant when she said defendant was trying to force her.

38

S.S. answered, "I mean he actually did penetrate me several times with my stitches inside my vagina, and when he didn't get any satisfaction there, he turned to the anus." Defense counsel objected and moved to strike, citing the court's in limine ruling, and the court struck the testimony. The prosecution next asked whether defendant ever held S.S. down, and S.S. responded affirmatively. The prosecution asked S.S. to describe defendant's conduct. S.S. stated that defendant would put his full weight on her and make sure she could not move while he penetrated her. The prosecution asked S.S. whether she communicated to defendant that she was not interested in having sex with him while he was putting his weight on her, and S.S. responded that she would tell him "no" and she did not "want that," but it had no effect on him.

Although the prosecution could have tailored its questions to S.S. regarding defendant's sexual conduct that was "against [her] will and forceful" more carefully to comply with the trial court's order disallowing evidence of "forceful [sex]," but permitting evidence that defendant held S.S. down to engage in sex acts, we find that the questioning did not constitute prosecutorial misconduct as it was neither " ' " 'so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process,' " ' " nor " 'the use of [a] deceptive or reprehensible method[] to attempt to persuade . . . the jury.' " (*Ledesma*, *supra*, 39 Cal.4th at p. 726.) Moreover, when it became clear that the testimony was straying into evidence ruled inadmissible by the court, defense counsel promptly objected and moved to strike.

And we find no violation of the court's order where the prosecution asked S.S. if she communicated her disinterest to defendant while he was holding her down. The trial court authorized the prosecution to elicit testimony regarding defendant's actions of "hold[ing] [S.S.] down and continu[ing] to proceed with sex." The prosecution's questions fell within the parameters of that ruling. Although the trial court excluded evidence that S.S. "*felt* she could not say no" and that S.S. "could not say no," it did not exclude evidence that defendant engaged in sexual conduct with S.S. when S.S. *did* say no. (Italics added.)

Because the prosecution did not commit misconduct when presenting its uncharged acts, defendant has not demonstrated ineffectiveness by his counsel in failing to object. (See *Thomas*, *supra*, 2 Cal.4th at p. 531.)

### c. *Submission of erroneous jury instructions*

Defendant contends that the jury instructions drafted by the prosecution on the section 1108 evidence (CALCRIM No. 1191A) and section 1101, subdivision (b) evidence (CALCRIM No. 375) were improper because they authorized the jury's consideration of evidence that was excluded under the trial court's in limine ruling. Defendant argues his counsel rendered ineffective assistance during the court's jury instruction conference "by objecting to the erroneous uncharged acts jury instructions without stating any of the correct legal grounds."[13]

The instruction on the section 1108 evidence stated that the prosecution presented evidence that "defendant committed the crimes of spousal rape; forcible sexual penetration; sodomy, against [S.S.] that was not charged in this case." The instruction on the section 1101, subdivision (b) evidence stated that the prosecution presented evidence that "defendant committed other offenses of . . . spousal rape; forcible sexual penetration; [and] sodomy, that were not charged in this case" and "evidence of other behavior by . . . defendant that was not charged in this case, obsession with digital and penile penetration of the anus."

As we discussed above, the trial court disallowed testimony from S.S.'s wife that "sex with . . . defendant was forceful," but it permitted evidence that defendant "held [S.S.] down to [engage in sex acts]," including anal penetration, and that defendant would have "sex" and "engage in sexual conduct" with S.S. while she pretended to be asleep. In addition, the trial court ruled that it would allow evidence that defendant "was obsessed with anal sex." Thus, we find defendant's claim that the uncharged acts instructions listed

_____

[13] Defendant expressly disavows a claim of instructional error with respect to the uncharged acts evidence.

40

excluded evidence unfounded. Accordingly, defendant has not established that his counsel was ineffective for failing to object to them. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 616 ["Because there was no sound legal basis for objection, counsel's failure to object . . . cannot establish ineffective assistance."].)

### d. *Improper argument on uncharged acts instructions and evidence*

Defendant contends that the prosecution committed misconduct when it erroneously argued to the jury (1) that an instruction would allow it to consider uncharged acts evidence "for corroboration," and (2) defendant's uncharged acts against S.S. were "consistent with the fact that [Doe 1] had injuries consistent with her anus being penetrated."

Defendant first argues that the prosecution's use of the word "corroboration" misstated how uncharged acts evidence could be used by the jury. However, defendant omits that soon after making this comment, the prosecution told the jury that if it determines the uncharged acts evidence had been proven by a preponderance of the evidence, it could "use [the acts] for a particular purpose," such as proof of identity or intent. The trial court's instructions also stated that if the jury determines defendant committed the uncharged acts, it could consider the evidence for the limited purpose of deciding whether defendant was the person who committed the charged offenses, whether defendant acted with the requisite intent, and whether defendant knew that Doe 1 was incapable of consenting. Thus, " '[i]n the context of the whole argument and the instructions,' " we determine there was no " 'reasonable likelihood the jury understood or applied the complained-of comment[] in an improper or erroneous manner. [Citations.]' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

Defendant next contends that the prosecution improperly "attempt[ed] to arouse the juror[s'] emotions and prejudice against [him]" when it urged the jury to consider the uncharged acts testimony of defendant's wife by arguing that the evidence was consistent with the penetration of Doe 1's anus. Defendant asserts that the prosecution's statement that "Doe 1 had injuries consistent with her anus being penetrated" was improper because there

41

was no evidence linking Doe 1's anal fissures to him and it was solely speculative that the fissures were caused by the commission of a sex offense. However, the SART nurse characterized the fissures to Doe 1's anus as blunt force trauma or penetration injuries. Given the evidence that Doe 1 could not consent to sex acts because of her severe developmental disability and the DNA results that established defendant had intercourse with Doe 1, we find the prosecution's statement came within its " 'wide-ranging right to discuss the case in closing argument.' " (*Thomas*, *supra*, 2 Cal.4th at p. 526.) It was up to the jury to determine whether the prosecution's " 'reasoning [was] faulty or the conclusions . . . illogical.' " (*Ibid.*)

For these reasons, we determine that defendant has not established his counsel rendered ineffective assistance in failing to object to the prosecution's alleged misconduct. (See *Thomas*, *supra*, 2 Cal.4th at p. 531.)

### F. *Cumulative Prejudice*

Defendant contends that his convictions must be reversed due to cumulative prejudice from the trial court's errors and his counsel's ineffective assistance.

"We have considered each claim on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the convictions." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

### IV. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
DANNER, J.

***People v. Saavedra***
**H046936**